**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

**RAYMOND TREJO,**

        **Plaintiff,**

**v.**                                        **2:19-cv-00561-GBW-KRS**

**THE DEMING PUBLIC SCHOOLS,**
**THE BOARD OF EDUCATION,**
**DEMING PUBLIC SCHOOLS BOARD**
**MEMBERS: BAYNE ANDERSON,**
**MATT ROBINSON, RON WOLFE,**
**WILLIAM RUIZ and SOPHIA CRUZ;**
**and, DEMING PUBLIC SCHOOLS**
**SUPERINTENDENT, ARSENIO**
**ROMERO,**

        **Defendants.**

## AMENDED COMPLAINT TO RECOVER DAMAGES FOR DEPRIVATION OF CIVIL RIGHTS AND PERSONAL INJURY

### JURISDICTION AND VENUE

Plaintiff brings this complaint under 42 U.S.C. Section 1983, the New Mexico Tort Claims Act, and the New Mexico Unfair Practices Act for damages resulting from the Deprivation of Civil Rights and Unfair Practices inflicted upon Plaintiff by Defendants.  The court has jurisdiction of this action (28 U.S.C. Sec. 1343) and of the parties.  Venue is proper in this judicial district as the incident complained of occurred in this district.  Plaintiff alleges as follows:

### PARTIES

1

1.      Plaintiff Raymond Trejo is an individual who is a resident of Deming, Luna County, State of New Mexico.

2.      Defendant Deming Public Schools (DPS or District) is a public agency in the State of New Mexico.

3.      Defendant Deming Public Schools Board of Education is the governing body of the Deming Public Schools.

4.      Defendant Bayne Anderson is the board president of the Deming Public Schools Board of Education.  Defendant was acting under color of state law and in the course and scope of his duties as an elected member with the Deming Public Schools Board of Education at all times material.

5.      Defendant Matt Robinson is the board vice president of the Deming Public Schools Board of Education.  Defendant was acting under color of state law and in the course and scope of his duties as an elected member with the Deming Public Schools Board of Education at all times material.

6.      Defendant Sophia Cruz is the board secretary of the Deming Public Schools Board of Education.  Defendant was acting under color of state law and in the course and scope of her duties as an elected member with the Deming Public Schools Board of Education at all times material.

7.      Defendant Ron Wolfe, at all times relevant to the issues herein, was a member of the Deming Public Schools Board of Education.  Defendant was acting under color of state law and in the course and scope of his duties as an elected member with the Deming Public Schools Board of Education at all times material.

8.      Defendant William Ruiz is a member of the Deming Public Schools Board of Education.  Defendant was acting under color of state law and in the course and scope of his duties as an elected member with the Deming Public Schools Board of Education at all times material.

9.      Defendant Arsenio Romero is the Superintendent of the Deming Public Schools. Defendant was acting under color of state law and in the course and scope of his employment as Superintendent of the Deming Public Schools at all times material.

## FACTUAL BACKGROUND

**Employment History:**

10.      Plaintiff began his employment with the DPS on August 19, 1992 when hired as a teacher. Plaintiff remained employed by and thrived in his career with DPS until his summary firing by Defendant Romero on June 28, 2018 Prior to his unlawful termination, Plaintiff garnered numerous promotions within the DPS as set forth more fully below.

11.      By July 1, 2001, Plaintiff was promoted to the position of Assistant Principal at Hofacket Middle School.

12.      Thereafter, Plaintiff was promoted on July 1, 2003 to the position of Principal at Hofacket Middle School.

13.      On or about July 1, 2005, Plaintiff was promoted to the position of Director of Transportation with supervisory authority over the transportation of approximately 3500 students on their daily commutes to and from the various school site in the DPS system, covering approximately eighty (80) routes.  Plaintiff also managed an annual budget of approximately two million dollars ($2,000,000), and the District' maintenance of its transportation vehicle fleet.  As

Transportation Director, Plaintiff also was the District/State school bus passenger management trainer and served on the Safety and Security Panel for Homeland Security.

14.     On or about July 1, 2013, Plaintiff was promoted to the position of Director of Student Services with supervisory authority over the implementation of strategies for closing the achievement gap, parent involvement, and equity and advocacy for all students in the DPS. Additionally, Plaintiff oversaw management of the summer school programs.  In addition to his duties as Director of Student Services, Plaintiff, from August 2014 through December 2014, also served as the Interim Director of Deming Cesar Chavez Charter High School when the high school lost its director.

15.     On July 1, 2015, Plaintiff was hired as Assistant Superintendent to the DPS under the direction of then Superintendent, Dr. Dan Lere.  Plaintiff's duties as Assistant Superintendent included; oversight of the Student Assistant Team process, alternative education, serving as liaison for the District charter school, assisting with the evaluation of school site administrators, coordinated District responses to Office of Civil Rights concerns, development of strategic plans for building capacity within the District, addressing parental and staff concerns, oversight of the truancy program, oversight of the District's grant implementation, served as an executive coach, was the District's media point of contact, and oversaw the departments of Activities/Athletics and District School Safety.  Plaintiff's duties did not include oversight of DPS Finance Department.  At all times during Plaintiff's tenure as Assistant Superintendent, the Finance Department remained under the direct supervision of DPS Superintendent Dr. Dan Lere.

**Plaintiff's Attendance at DPS Financial Exit Audit:**

16.     Merely three (3) months into his tenure as Assistant Superintendent, Plaintiff was

directed by Superintendent Lere to attend the exit audit meeting conducted by DPS's then

accounting firm Stone McGee & Co.  Plaintiff had never attended a DPS exit audit meeting prior

to this request, but was informed by Superintendent Lere that his presence was required because

he, Superintendent Lere, could not attend the meeting.  DPS's then Finance Director and

Business Manager, Ted Burr and Diana Peterson also attended the exit audit meeting.  Mr. Stone

McGee gave the presentation to the DPS staff in attendance. Mr. McGee's presentation was

short, and he stated that over all everything was good with the financials.  At the close of the

meeting Mr. McGee also noted that there was one thing at Deming High School but that he could

not "put his finger on anything," or "figure it out."  He further stated that he did not want to call

it fraud or embezzlement, and that he could not figure it out, but there was just something weird.

Plaintiff was unaware of any improprieties at Deming High School at this time, but determined

that he would apprise Superintendent Lere of the substance of the exit audit upon Lere's return to

the District.

    17.    Upon Superintendent Lere's return to the District Offices, Plaintiff immediately

briefed him on the exit audit meeting and that Mr. McGee had been mentioned something

possible about Deming High School.  Briefing Superintendent Lere concluded Plaintiff's

obligations at that time relative to the exit audit.

    18.    Sometime after the audit exit meeting, Plaintiff ran into the DPS Business

Manager, Diane Peterson, and asked about Mr. McGee's comment regarding an issue at Deming

High School.  Business Manager Peterson informed Plaintiff that she was aware that the high

school was having problems with receipts but referenced the issue as one with the accounting

software, Triadic.  Business Manager Peterson also informed Plaintiff that she had mentioned the

receipt issue to the DPS Finance Manager, Ted Burr, but that nothing ever resulted from their

conversation.  She made no reference to Plaintiff to any suspicion relative to any high school

staff charged with the handling high school funds.  Plaintiff's position as Assistant

Superintendent did not grant him oversight over the District's Finance Department.

**Plaintiff's Informal Interactions with Finance Department Staff:**

19.     Over the next several months, Plaintiff had more conversations with Business

Manager Peterson in which he recommended that the Finance Department become more engaged

with the schools, particularly those handling monies.

20.     During those same months, Plaintiff's only directive from Superintendent Lere

regarding the Finance Department was to oversee the implementation of a process to streamline

DPS's payments to its vendors.  The DPS had gained a reputation in the community for

consistently being tardy with its vendor payments.  Following the directive from Superintendent

Lere, Plaintiff met with DPS vendors to discuss the arrears of the DPS and the process in place

for seeking payments. Following those meetings, Plaintiff met with Business Manager Peterson

to discuss and implement processes for improving the timely payment of DPS's vendor invoices.

During these discussions, Business Manager Peterson would merely place blame for the

District's late payments on the Triadic accounting software used by the District.

21.     In addition to Business Manager Peterson's complaints about the Triadic system,

Plaintiff also learned of complaints about Triadic from the Deming High School's head

secretary, Beatrice Armendariz.  In February 2016, due to the number of complaints and

complainants, Plaintiff began inquiring about new finance accounting software for the District.

Demonstrations were arranged for two competing finance software systems.  Mr. Burr seemed

uninterested in the demonstrations and was overheard commenting that he did not want to learn a new software system as he was nearing retirement from the District.

22.     Over the remaining months in the 2015-2016 school year, Plaintiff was approached by various finance department staff members, each complaining about lack of communication from finance department supervisors, or of the lack of adherence to the District's purchase order requirements.

23.     More issues regarding the Finance Department came to Plaintiff's attention. For instance, the department was still using paper time cards to track employee time. As a result, paychecks were often unreliable relative to vacation time and available sick leave.

24.     Plaintiff briefed Superintendent Lere on the complaints he was receiving and the issues he was discovering. As a result, Superintendent Lere directed Plaintiff to investigate the payroll and purchase order issues emanating from the Finance Department.

**Luna County Cancer Support Fundraiser:**

25.     In April 2016 Plaintiff received a telephone call from Ms. Joanna Costilla, Executive Director, Luna County Cancer Supports (LCCS). Ms. Costilla inquired whether the District had received a check from Deming High School from a LCCS fundraising event. The normal process for such fundraising was that the affiliated school would collect the monies raised and forward a check to the District Offices to be disbursed to the charitable organization. Ms. Costilla also stated to Plaintiff that she was inquiring because she had received a telephone call from Deming High School secretary, Ms. Irma Harrison who informed her that she had gotten many complaints from teachers who had donated to the fundraiser but had not received notice that their checks clear their banks.

26.     Shortly following his conversation with Ms. Costilla, Plaintiff received a request from Ms. Harrison for a meeting outside the Deming High School campus.  Ms. Harrison told Plaintiff that she did not want to meet at the high school because she feared possible reprisal from the head secretary and Deming High School Principal, Janean Garney.

27.     To accommodate her, Plaintiff agreed to meet with Ms. Harrison at the District's Florida Branch Offices.  During the meeting, Ms. Harrison told Plaintiff that she and another staff member collected and counted the money from the LCCS fundraiser and turned it over to Ms. Bea Armendariz, Deming High School Administrative Assistant.  Ms. Harrison also mentioned that Ms. Armendariz refused to provide her with a receipt for the money.  This was the first time Plaintiff had been apprised by any staff member regarding alleged financial improprieties at the High School by Ms. Armendariz.  Plaintiff was concerned by the information provided by Ms. Harrison.

28.     Consequently, Plaintiff immediately met with Superintendent Lere and, knowing he was not granted general oversight over the Finance Department, sought permission from Superintendent Lere to investigate the missing fundraising money.  Superintendent Lere agreed to give Plaintiff limited authority to review the issue of the alleged missing fundraising money.

29.     Working under Superintendent Lere's direction, Plaintiff had a scheduled meeting with Principal Garney at Deming High School to discuss the Master Schedule for the 2016-2017 school year.  During the meeting Plaintiff asked Principal Garney about the LCCS fundraiser. She told Plaintiff that it was successful and recited the approximate amount raised, which aligned with the amount Ms. Harrison had informed Plaintiff.  However, Principal Garney seemed surprised when informed that LCCS had not yet received the fundraising money.  She informed

Plaintiff that she would investigate the matter.  A few days later, Plaintiff received another

telephone call from Ms. Costilla to inform him that Ms. Armendariz had called her to request an

invoice from LCCS for the amount of the fundraising money.  Ms. Armendariz further stated that

the invoice was required to proceed with the District's purchase order process.

30.     Within a week of providing the invoice, LCCS received a check, but in an amount

greater than what Ms. Harrison had previously informed her had been raised, and for more than

had been invoiced by LCCS.  Around the same time that Ms. Armendariz had requested an

invoice from Ms. Costilla, Plaintiff discovered that an invoice had been placed on his desk from

the Deming High School Student Store for a cancer support donation.  Coincidentally, that very

day Ms. Sheila Offutt, the student store employee, happened to pass by Plaintiff's office.

Plaintiff invited her into his office and thanked her for the student store donation.  Ms. Offutt

expressed surprise and asked to what Plaintiff was referring.  When Plaintiff showed her the

student store's invoice, he found on his desk that very morning, she told him that the invoice was

from the prior year's fundraiser.  Plaintiff asked why she had submitted an invoice from the prior

school year listing the amount raised for the current school year's fundraiser.  She replied that

she was directed to produce the invoice by Ms. Armendariz and feared retaliation if she had

refused to produce the invoice.  Plaintiff thanked Ms. Offutt for her candor.

**Investigation into Deming High School Finances: May through July 2016**

31.     Following the revelation from Ms. Offutt regarding a fake invoice, Plaintiff met

with Business Manager Peterson to inform her of the issues surrounding the fundraiser at

Deming High School.  Business Manager Peterson responded that they had always been issues

with Ms. Armendariz at the high school, particularly with deposits and receipts from monies

collected from students and teachers relative to lab fees.  Alarmed, Plaintiff requested to see deposit records for the high school.  Business Manager Peterson directed Plaintiff to finance department employee Rosa Marrufo, who oversaw those records.  Plaintiff proceeded to Ms. Marrufo's office and requested to see the high school's past year deposit records.

32.     After two days, Plaintiff returned to Ms. Marrufo's office, but she did not produce any documents.  She informed Plaintiff that Business Manager Peterson would get back to Plaintiff regarding the requested records.  This request and failure to produce documents continued for several weeks.

33.     In or around late May or early June 2016, after several weeks of requesting records, Plaintiff arrived at his office on a Monday morning to find deposit records from the high school on his desk.  Business Manager Peterson had apparently chosen to leave them there over the weekend. Upon review, Plaintiff discovered that there were entire months where no deposits had been recorded into the Deming High School bank account, despite the District requirement that deposits be made daily.  Plaintiff then returned to Ms. Maruffo and asked why she had not reported the high school's failure to make daily deposits.  Ms. Maruffo would not provide a response directly to Plaintiff, instead telling him that he must speak to her supervisor Business Manager Peterson.

34.     Instead, Plaintiff immediately reported the high school's failure to follow procedure on deposits to Superintendent Lere.  Plaintiff and Superintendent Lere then met twice with Principal Garney and Ms. Armendariz seeking an explanation for the deviation from District deposit procedures.  During the first meeting Ms. Armendariz explained the issue away by blaming it on software and hardware (receipt printer) constantly giving her error messages

when she attempted to print out receipts.  Superintendent Lere decided to give the high school an opportunity to go back and reconcile its deposit and cash receipts records.

35.    The second meeting was a follow up on the Superintendent's directive to the high school to reconcile its accounting records.  At the meeting, Ms. Armendariz merely presented emails from her to Ms. Garney in which she had reported issues with the high school's accounting software.  Harboring some suspicions, Plaintiff directed Ms. Garney to remove Ms. Armendariz from the handling any finances at the high school.  Plaintiff then directed Mr. Bernie Chavez, Deming High School Activities Director, to have his department assume all responsibilities for the collection of all high school fines and fees.  This procedure was carried over into the 2016-2017 school year.  Plaintiff also removed the task of reconciling the high schools deposit accounts from Ms. Garney and Ms. Armendariz and reassigned it to other District staff.

36.    After approximately a month, Plaintiff received updated reconciliation sheets from District staff for every account overseen by Ms. Armendariz for the past year.  What immediately stood out was the high school's laptop lab fees account.  This deposit account had a fraction of the $30,000 that would have been deposited if 100% of student's fees had been collected.  Plaintiff was presented with what may have been unauthorized use of school funds, but further investigation was required to determine the process for collection of the lab fees and whether other means of accounting for the fees had been utilized; for example, students unable to afford the fees being billed through the District's Student Information System, Infinite Campus.

37.    Plaintiff briefed Superintendent Lere and Finance Director Burr of his findings and the potential misuse of high school funds.  Meanwhile, the District continued its review of

the high school's accounting records, collecting additional information and noting any

discrepancies.

38.     In July 2016, Ms. Armendariz submitted a letter of resignation from the DPS.  For

reasons unknown to Plaintiff, Ms. Armendariz continued working for the District subsequent to

tendering her letter of resignation.  Her final day of employment with the District was August 19,

2016.

39.     On or about August 17, 2016, Plaintiff briefed Dr. Lere of findings regarding the

Deming High School matter, at which time Dr. Lere directed Plaintiff to contact the Deming

Police Department.  Thereafter, Plaintiff contacted Deming Chief of Police Robert Orosco to

report a possible incident of embezzlement at the high school.  Two detectives from the Deming

Police Department were dispatched to meet with Plaintiff at his District office.  The detectives

took a report and copies of records as possible evidence.

40.     On or about August 19, 2016, Plaintiff provided Mr. Burr with a briefing of his

review of the Deming High School's deposit records and Plaintiff's report of same to the

Deming Police Department.  At the briefing, Mr. Burr informed Plaintiff, for the first time, that

the District may have a reporting obligation to inform the New Mexico State Auditor of the

potential financial discrepancies at Deming High School.  Plaintiff immediately contacted the

New Mexico Office of the State Auditor to report the possible mishandling of funds at the high

school.  The state auditor's office requested that Plaintiff also inform the District's local auditor

of the potential wrongdoing and investigation.  In compliance with the state auditor's request,

Plaintiff directed Finance Director Burr to notify District's local auditing firm, Moss Adams.

41.     On August 30, 2016, Plaintiff received an email from Mr. Brendan Miller, Staff

Auditor Special Investigations, New Mexico Office of the State Auditor, acknowledging receipt of the District's notice of possible embezzlement and thanking Plaintiff for the notice.

42.    By letter dated December 2, 2016, Superintendent Lere was notified by the State Auditor that the DPS had been designated for a forensic audit based on its self-reporting of possible embezzlement at Deming High School. The State Auditor's letter acknowledged that the District had fulfilled its reporting obligations under NMSA 1978, Section 12-6-6. The State Auditor copied the DPS Governing Board on this letter.

43.    Superintendent Lere and Finance Director Burr began the process of hiring a forensic auditing firm.  The Jaramillo Accounting Group (JAG) was awarded a District contract in May 2017 to conduct the forensic accounting required by the State Auditor.  As part of its forensic audit, JAG began interviewing District employees with potential knowledge of the potential embezzlement at the Deming High School.

**Plaintiff's Interactions with New District Superintendent Romero And Retaliatory Actions against Plaintiff:**

44.    Plaintiff had surgery on May 15, 2017 and was on medical leave from the District for several weeks.  During his recuperation at home, Plaintiff was visited by newly hired DPS Superintendent Arsenio Romero.  Plaintiff briefed Mr. Romero on items he had been working on during the school year, including the investigation into the finances at Deming High School. Prior to leaving Plaintiff's home, Mr. Romero sought assurances that there were no hard feelings being as both he and Plaintiff had been under consideration for the Superintendent position opened by Dr. Lere's pending retirement.  Plaintiff assured Mr. Romero that he was glad to be continuing in his current position in the new administration and that he was excited to be

working with Mr. Romero in the coming school year.  Mr. Romero assumed the DPS

Superintendent position upon Dr. Lere's retirement from the District at the end of May 2017.

45.     Just prior to his departure from DPS, Dr. Lere had expressed to Plaintiff that he

had received pressure from two DPS board members to eliminate Plaintiff's position.  Dr. Lere

further expressed that Defendants Anderson and Robinson had several conversations with him,

with them stating their opinion that it was time for Plaintiff to start looking for another job in

another district.

46.     Plaintiff is informed and believes, and on that basis alleges, that these

conversations so greatly concerned Dr. Lere that he memorialized their substance in an email to

Defendants Anderson and Robinson, dated May 11, 2017.  In this email Dr. Lere advised

Defendants Anderson and Robinson that the position that Plaintiff held had been in existence in

the DPS for at least a decade before his own arrival at the District.  The position was held by a

Caucasian woman, Mary Lou Cameron, whom the District paid more than Plaintiff's current

District salary.  Dr. Lere also expressed his belief that Plaintiff's race/ethnicity was the driving

force behind Defendants Anderson's and Robinson's desire to eliminate Plaintiff from DPS.

47.     Plaintiff returned to work from his medical leave in early June 2017.  Plaintiff

attended the June 9, 2017 DPS Board work session meeting wherein the board took up the

elimination of Plaintiff's position.  From the time of his return from medical leave throughout the

month of June 2017, Plaintiff had very little interaction with Defendant Romero.  This concerned

Plaintiff to such an extent that he requested a meeting with Defendant Romero in Mid-July 2017.

Plaintiff and Defendant Romero had a very brief meeting during which Defendant Romero

announced to Plaintiff that he was removing Plaintiff from his Assistant Superintendent position

and transferring him to be Director of Maintenance, a position not requiring an administrative credential.  Upon hearing Defendant Romero's decision, Plaintiff asked whether the move was determined by pressure from the DPS school board.  In response, Defendant Romero nodded his head in assent.

48.     Following his demotion to Director of Maintenance, Plaintiff had no further involvement in the investigation of the potential financial improprieties at Deming High School or the audit being conducted by JAG.

49.     On or about December 4, 2017, JAG issued its Forensic Audit Report regarding potential financial improprieties at Deming High School.  Even though Plaintiff had initiated the investigation into the finances at the high school and was responsible for reporting same to the New Mexico State Auditor and the local police department, Plaintiff was not interviewed by JAG relative to their forensic audit.  As a result, Plaintiff was unable to identify, on behalf of the District, the many inaccuracies and mistakes within JAG's final report. Some of those inaccuracies erroneously accused Plaintiff of having responsibility for oversight of the DPS Finance Department and failing in that oversight duty.

50.     Plaintiff is informed and believes, and on that basis alleges, that on December 4, 2017 Defendants released an un-redacted copy of the mistake laden JAG Forensic Audit Report to the public and local newspaper.

51.     On December 5, 2017, Defendant Romero placed Plaintiff on administrative leave, pending an investigation, from DPS with directives to refrain from entering District property or from contacting District employees.

52.     Plaintiff had no further communication with the District until he received a letter

from Defendant Romero on May 7, 2018 stating that Plaintiff could not "be placed in any …

position within the School District."  Defendant Romero went on to accuse Plaintiff of improper

"supervision of an employee who embezzled money" from Deming High School.

53.     Defendant Romero's summary dismissal of Plaintiff was perpetrated without

granting Plaintiff a hearing.

**Exhaustion of Administrative Remedies**

54.     Plaintiff filed a charge with the Office of Civil Rights regarding Defendants'

alleged discriminatory conduct on May 7, 2018.  To the best of Plaintiff's recollection, The

Equal Opportunity Commission has not issued a Notice of Right to Sue letter.

55.     Sixty (60) days or more have passed since the filing of Plaintiff's charge of age

discrimination with the Office of Civil Rights regarding Defendants' alleged discriminatory

conduct.

## CLAIMS

### CLAIM FOR DAMAGES NO. 1
### VIOLATION OF FOURTEENTH AMENDMENT PROCEDURAL DUE PROCESS
### RIGHTS

56.     Plaintiff incorporates the preceding paragraphs as though they were fully stated

herein.

57.     In practice, the Deming Public Schools and Deming Public Board of Education

have used its administration and staff to harass and deprive Plaintiff of his civil liberties.

58.     Defendants falsely accused Plaintiff of negligence in the administration of his

duties within the Deming Public Schools.

59.     Defendants, individually and in their official capacities, used their authority to

interfere with Plaintiff's property interest which entitles Plaintiff the right continued employment within the Deming Public Schools.

60.     Defendants' conduct, either in their individual acts or official capacities, caused Plaintiff to be summarily terminated from his employment with the Deming Public Schools, depriving him of fundamental property interests.

61.     Defendants have ignored procedural and substantive Due Process requirements in an unlawful campaign to harass, punish and terminate Plaintiff who they falsely accused of negligence in the performance of his employment duties.

62.     Defendants' actions intentionally and willfully deprived Plaintiff of his property interests without due process of law and without recourse for the arbitrary, abusive, and harassing conduct of Defendants.

63.     Defendants' actions proximately caused damages to Plaintiff as previously alleged.

**64.**     Defendants acted willfully, knowingly and/or purposefully, and with deliberate indifference to deprive Plaintiff of his constitutional rights. Due to the nature of Defendants' conduct, Plaintiff is entitled to recover punitive damages against the individual Defendants.

**CLAIM FOR DAMAGES NO. 2**
**VIOLATION OF CIVIL RIGHTS – TITLE VII OF THE CIVIL RIGHTS ACT OF 164,**
**AS CODIFIED, 42 U.S.C. SECTIONS 2000e TO 2000e-17 (race, color, gender, and**
**national origin)**

65.     Plaintiff incorporates the preceding paragraphs as though they were fully stated herein.

66.     Section 703 of Title VII, 42 U.S.C. section 2000e prohibits practices that discriminate against persons on the basis of their national origin.  Plaintiff is informed and

believes and, on that basis, alleges that Defendants' actions to demote and subsequently terminate Plaintiff's employment with the DPS was based on Plaintiff's national origin, Latino.

67.     As a direct, legal and proximate result of the discrimination, Plaintiff has sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial.

68.     Defendants' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiff's right to be free from discrimination based on national origin.

**69.**     Plaintiff is entitled to his reasonable attorney's fees and costs of suit.

**CLAIM NO. 3**
**NATIONAL ORIGIN BASED DISCRIMINATION (Hostile Work Environment) IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 164, AS CODIFIED, 42 U.S.C. SECTIONS 2000e TO 2000e-17 (race, color, gender, and national origin)**

70.     Plaintiff incorporates the preceding paragraphs as though they were fully stated herein.

71.     Plaintiff was subjected to harassment by Defendants' officers, agents and employees, including Mr. Anderson, Mr. Robinson and Mr. Romero, because of his national origin, Latino.

72.     Plaintiff was subjected to verbal and written conduct by Defendants' agents and employees, including Mr. Anderson, Mr. Robinson, and Mr. Romero.

73.     Defendants' agents and employees' conduct was not welcomed by Plaintiff.

74.     Defendants' agents' and employees' conduct was undertaken because of Plaintiff's national origin, Latino.

75.     The conduct was so severe or pervasive that reasonable persons in Plaintiff's positions would find their work environment to be hostile or abusive.

76.     Plaintiff believed his work environment to be hostile or abusive as a result of Defendants' agents' and employees' conduct.

77.     DPS Governing Board members instigated, knew, or should have known, of the abusive conduct. Defendants were provided with information sufficient to raise a probability of national origin harassment in the mind of a reasonable employer. Moreover, the harassment was so pervasive and open that a reasonable employer would have had to have been aware of it. Indeed, board members and officer level employees were themselves complicit in the abusive conduct.

78.     Defendants did not exercise reasonable care to prevent harassment in the workplace on the basis of national origin and did not exercise reasonable care to promptly correct any harassing behavior that did occur.

79.     As a direct, legal and proximate result of the discrimination, Plaintiff has sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial.

80.     Defendants' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiff's right to be free from discrimination based on national origin.

81.     Plaintiff is entitled to his reasonable attorneys' fees and costs of suit.

**CLAIM FOR DAMAGES NO. 4**
**NATIONAL ORIGIN BASED DISCRIMINATION IN VIOLATION OF NEW MEXICO**
**LAW AGAINST DISCRIMINATION**

**NMSA 1978, SECTION 28-1-7**

82.     Plaintiff incorporates the preceding paragraphs as though they were fully stated herein.

83.     The New Mexico Human Rights Act (NMHRA) makes it an unlawful discriminatory practice for an employer to discriminate on the basis of race, age, religion, color, national origin, ancestry, sex, physical or mental handicap, or medical condition.

84.     Plaintiff is informed and believes and upon that basis alleges that Defendants' termination of his employment was neither manifestly job related nor consistent with business necessity.

85.     As a direct, legal and proximate result of the discrimination, Plaintiff has sustained, and will continue to sustain, economic damages to be proven at trial.

86.     As a result of Defendants' actions, Plaintiff has suffered emotional distress, resulting in damages in an amount to be proven at trial.

87.     Plaintiff further seeks compensatory and punitive damages and all other injunctive, declaratory, and monetary relief available for discrimination at trial.

88.     Defendants' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiff's right to be free from discrimination based on national origin and ancestry.

89.     Plaintiff is entitled to his reasonable attorneys' fees and costs of suit.

**CLAIM FOR DAMAGES NO. 5**
**NATIONAL ORIGIN BASED DISCRIMINATION (Hostile Work Environment) IN**
**VIOLATION OF NEW MEXICO LAW AGAINST DISCRIMINATION**
**NMSA 1978, § 28-1-7**

90.     Plaintiff incorporates the preceding paragraphs as though they were fully stated

herein.

91.     Plaintiff was subjected to harassment by Defendants' officers, agents and

employees, including Mr. Anderson, Mr. Robinson and Mr. Romero, because of his national

origin, Latino.

92.     Plaintiff was subjected to verbal and written conduct by Defendants' agents and

employees, including Mr. Anderson, Mr. Robinson, and Mr.

Romero.

93.     Defendants' agents and employees' conduct was not welcomed by Plaintiff.

94.     Defendants' agents' and employees' conduct was undertaken because of

Plaintiff's national origin, Latino.

95.     The conduct was so severe or pervasive that reasonable persons in Plaintiff's

positions would find their work environment to be hostile or abusive.

96.     Plaintiff believed his work environment to be hostile or abusive as a result of

Defendants' agents' and employees' conduct.

97.     DPS Governing Board members instigated, knew, or should have known, of the

abusive conduct. Defendants were provided with information sufficient to raise a probability of

national origin harassment in the mind of a reasonable employer. Moreover, the harassment was

so pervasive and open that a reasonable employer would have had to have been aware of it.

Indeed, board members and officer level employees were themselves complicit in the abusive

conduct.

98.     Defendants did not exercise reasonable care to prevent harassment in the

workplace on the basis of national origin and did not exercise reasonable care to promptly

correct any harassing behavior that did occur.

99.     As a direct, legal and proximate result of the discrimination, Plaintiff has

sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in

an amount to be proven at trial.

100.     Defendants' unlawful actions were intentional, willful, malicious, and/or done

with reckless disregard to Plaintiff's right to be free from discrimination based on national

origin.

101.     Plaintiff is entitled to his reasonable attorneys' fees and costs of suit.

**CLAIM FOR DAMAGES NO. 6**
**NATIONAL ORIGIN BASED DISCRIMINATION IN VIOLATION OF NEW MEXICO**
**LAW AGAINST DISCRIMINATION**
**NMSA 1978, § 28-1-7**

102.     Plaintiff incorporates the preceding paragraphs as though they were fully stated

herein.

103.     Plaintiff was terminated from his employment with the DPS by Defendants'

officers, agents and employees, including Mr. Anderson, Mr. Robinson and Mr. Romero,

because of his national origin, Latino.

104.     Plaintiff was subjected to verbal and written conduct by Defendants' agents and

employees, including Mr. Anderson, Mr. Robinson, and Mr.

Romero.

105.     Defendants' agents and employees' conduct was not welcomed by Plaintiff.

106.     Defendants' agents' and employees' conduct was undertaken because of

Plaintiff's national origin, Latino.

107.     DPS Governing Board members instigated, knew, or should have known, of the

discriminatory conduct.

108.    As a direct, legal and proximate result of the discrimination, Plaintiff has

sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in

an amount to be proven at trial.

109.    Defendants' unlawful actions were intentional, willful, malicious, and/or done

with reckless disregard to Plaintiff's right to be free from discrimination based on national

origin.

110.    Plaintiff is entitled to his reasonable attorneys' fees and costs of suit.

**CLAIM FOR DAMAGES NO.7**
**AGE BASED DISCRIMINATION IN VIOLATION OF NEW MEXICO LAW AGAINST**
**DISCRIMINATION**
**NMSA 1978, § 28-1-7**

111.    Plaintiff incorporates the preceding paragraphs as though they were fully stated

herein.

112.    Plaintiff, at all times relevant hereto, was over the age of 40.

113.    Plaintiff was terminated from his employment with the DPS by Defendants'

officers, agents and employees, including Mr. Anderson, Mr. Robinson and Mr. Romero,

because of his age.

114.    Plaintiff was subjected to verbal and written conduct by Defendants' agents and

employees, including Mr. Anderson, Mr. Robinson, and Mr.

Romero.

115.    Defendants' agents and employees' conduct was not welcomed by Plaintiff.

116.    Defendants' agents' and employees' conduct was undertaken because of

Plaintiff's age.

117.    DPS Governing Board members instigated, knew, or should have known, of the discriminatory conduct.

118.    As a direct, legal and proximate result of the discrimination, Plaintiff has sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial.

119.    Defendants' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiff's right to be free from discrimination based on national origin.

120.    Plaintiff is entitled to his reasonable attorneys' fees and costs of suit.

**CLAIM NO. 8**
**AGE BASED DISCRIMINATION IN VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT**
**29 U.S.C. SECTIONS 621 ET SEQ.**

121.    Plaintiff incorporates the preceding paragraphs as though they were fully stated herein.

122.    Plaintiff, at all times relevant hereto, was over the age of 40.

123.    Plaintiff was terminated from his employment with the DPS by Defendants' officers, agents and employees, including Mr. Anderson, Mr. Robinson and Mr. Romero, because of his age.

124.    Plaintiff was subjected to verbal and written conduct by Defendants' agents and employees, including Mr. Anderson, Mr. Robinson, and Mr. Romero.

125.    Defendants' agents and employees' conduct was not welcomed by Plaintiff.

126.    Defendants' agents' and employees' conduct was undertaken because of

24

Plaintiff's age.

127.    DPS Governing Board members instigated, knew, or should have known, of the discriminatory conduct.

128.    As a direct, legal and proximate result of the discrimination, Plaintiff has sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial.

129.    Defendants' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiff's right to be free from discrimination based on national origin.

130.    Plaintiff is entitled to his reasonable attorneys' fees and costs of suit.

**CLAIM NO. 9**
**RETALIATION IN VIOLATION OF NEW MEXICO WHISTLEBLOWER**
**PROTECTION ACT**
**NMSA 1978, SECTION 10-16C-1**

131.    Plaintiff incorporates the preceding paragraphs as though they were fully stated herein.

132.    The New Mexico Whistleblowers Protection Act, NMSA 1978, § 10-16C-1 (WPA) prohibits a public employer from taking retaliatory action against a public employee based on the public employee's communication of information related to an unlawful or improper act.

133.    Plaintiff is informed and believes and upon that basis alleges that Defendants' termination of his employment was in retaliation for his reporting of potential financial improprieties within the Deming Public Schools.

134.    As a direct, legal and proximate result of the retaliation, Plaintiff has sustained,

and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial.

136. Defendants acted willfully, knowingly and/or purposefully, and with deliberate indifference to deprive Plaintiff of his statutory rights to be free from retaliation based on his reporting of a potential fraud against New Mexico taxpayers.

136. Plaintiff is entitled to his reasonable attorneys' fees and costs of suit.

## CLAIM NO. 10
## VIOLATION OF RIGHT TO PRIVACY - NEW MEXICO

137. Plaintiff incorporates the preceding paragraphs as though they were fully stated herein.

138. Thereafter, beginning on December 4, 2017, and continuing up to the present, Defendants have invaded Plaintiff's right to privacy and solitude by, without Plaintiff's consent, amongst other things, providing an un-redacted copy of the JAG Financial Audit report to the local newspaper for general publication.

139.  As a result, Plaintiff has been exposed to public ridicule, contempt and disgrace and Plaintiff's standing in the community has been injured, causing severe mental anguish and distress, all to Plaintiff's damage in an amount to be proved at trial.

140. Plaintiff is entitled to his reasonable attorneys' fees and costs of suit.

## **JURY DEMAND**

141. Plaintiff hereby demands trial by jury.

## **REQUEST FOR RELIEF**

Plaintiff incorporates the preceding paragraphs by reference herein.

**WHEREFORE**, Plaintiff seeks the following relief:

A.     For a declaration that Defendants' actions, policies, and practices as alleged herein are unlawful.

B.     For reinstatement.

C.     Actual and compensatory damages sufficient to make him whole.

D.     Punitive damages against Defendants sufficient to punish them and to deter further wrongdoing;

E.     Treble damages;

F.     Injunctive relief sufficient to protect Plaintiff and his family from the ongoing harassment and intimidation of Defendants.

G.     Attorneys' fees, litigation expenses, costs, pre- and post-judgment interest as provided by law; and

H.     Such other and further relief as the Court deems just and proper.


Respectfully submitted,

SHERMAN & SHERMAN


By:/s/ Jakub F. Sherman
Attorneys for Plaintiff
210 South Silver Ave.
Deming, NM  88030-3716
(575) 546-8846
(575) 546-8847 FAX
Jakub33@gmail.com